NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 05a0445n.06
Filed: May 26, 2005

Nos. 04-5601 & 04-5696

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

UNITED STATES of AMERICA,

 Plaintiff-Appellee,

          On Appeal from the United States District
v.            Court for the Western District of Kentucky

DUMONDE WILEY (04-5601) and
SIDNEY FLETCHER (04-5696),    **OPINION**

 Defendants-Appellants.

_____/

**Before: ROGERS and SILER, Circuit Judges; and REEVES, District Judge.**[*]

 **DANNY C. REEVES, District Judge.** Defendants-Appellants Dumonde Wiley and Sidney Fletcher appeal their jury convictions and sentences for eleven counts of interference with interstate commerce by threat of violence, a violation of the Hobbs Act, 18 U.S.C. § 1951(a), and eleven counts of use of a firearm in a crime of violence, a violation of 18 U.S.C. § 924(c)(1)(A). For the reasons set forth below, we **AFFIRM** the judgment of the district court.

_____

[*] The Honorable Danny C. Reeves, United States District Judge for the Eastern District of Kentucky, sitting by designation.

-1-

## BACKGROUND

In February and March 2001, numerous Louisville businesses were robbed at gunpoint by Dumonde Wiley and Sidney Fletcher. Their crime spree ended on March 22, 2001, when Officer Larry Singleton of the Louisville Police Department observed the Defendants running toward a getaway car parked in an alley behind a Subway restaurant that had just been robbed. Officer Singleton called for backup and a K-9 unit was dispatched. The police dog followed the suspects' scent and alerted officers to a nearby shed. Fletcher, who was hiding inside, turned himself in to police. He was arrested and taken to police headquarters. Once there, he was read his rights, which he waived, and was questioned. During questioning, Fletcher admitted to the robberies and provided the police with details about them.

Although Wiley escaped initially, Louisville police later discovered his whereabouts, resulting in his arrest on June 13, 2001. Wiley was advised of his rights, executed a waiver, and also confessed to his involvement in the robberies. Wiley, like Fletcher, also provided police extensive details about the crimes.

After state charges had been filed, the Defendants were indicted under the Hobbs Act, 18 U.S.C. § 1951, for thirteen robberies committed in the Louisville area during February and March 2001.[1] Because firearms were used in the commission of the robberies, the Defendants

---

[1] Police suspected the Defendants were involved in a total of 31 robberies in the Louisville area between January and March 2001. Matt Batcheldor, *Police Say Suspect is Motel Robber*, Louisville Courier-Journal, June 14, 2001.

were also charged with separate counts of using a firearm in relation to crimes of violence in violation of 18 U.S.C. § 924(c).

The Defendants were tried together over their objections in February 2004. Following the close of the United States' proof, the district court granted a motion to dismiss counts related to two of the robberies because the requisite testimony concerning interstate commerce revealed only that the hotels involved had "out of town" guests instead of "out of state" guests. Thus, the required interstate nexus was not met to support a conviction for these offenses. The jury found the Defendants guilty of all counts submitted to it for the eleven remaining robberies. Both Wiley and Fletcher were sentenced to 3,184 months.

## STANDARD OF REVIEW

This Court reviews factual findings regarding a confession for clear error, but reviews the ultimate question of voluntariness *de novo*. *United States v. Marks*, 209 F.3d 577, 581 (6th Cir. 2000). In addition, constitutional challenges to criminal convictions are reviewed *de novo*, as questions of law. *United States v. Smith*, 182 F.3d 452, 455 (6th Cir. 1999). If the proper standard was applied, "when a defendant challenges the sufficiency of the evidence to support a conviction, we inquire whether, viewing the evidence in the light most favorable to the government, any rational trier of fact could have found the essential elements of the offense proven beyond a reasonable doubt." *Id*. at 456. Finally, the denial of a severance motion is reviewed "for clear abuse of discretion." *United States v. Critton*, 43 F.3d 1089, 1098 (6th Cir. 1995).

## DISCUSSION

The Defendants raise four arguments on appeal: (1) Wiley's confession was not knowing and voluntary and it violated his right to counsel; (2) the *de minimis* contact with interstate commerce test for Hobbs Act jurisdiction oversteps the federal government's power under the commerce clause and, regardless, the burglaries in this case did not satisfy the *de minimis* test; (3) the district court erred in denying Wiley's severance motion; and (4) the sentences violate the Defendants' Fifth, Sixth, and Eighth Amendment rights.

### I.     Wiley's Confession

Wiley maintains that his confession was not voluntary and should have been suppressed because: (1) he was coerced into confessing by the promise of a reduced sentence; (2) he was never permitted to contact an attorney and was questioned after he invoked his right to counsel; and (3) he was never asked to read the rights waiver form that he signed. A suppression hearing was held in the district court concerning the admissibility of both Defendants' statements. The magistrate recommended denying the motions, a decision the district court affirmed after conducting a *de novo* review.

This Court has recently reviewed the relevant consideration for claims of a coercive confession.

> The state bears the burden of proving that a defendant "voluntarily, knowingly, and intelligently waived his right to silence and counsel." *United States v. Bentley,* 726 F.2d 1124, 1126 (6th Cir. 1984). This Court uses a "totality of the circumstances" [test] to determine whether a petitioner's statements were involuntary. *Brown v. Illinois,* 422 U.S. 590 (1975). The Supreme Court has

> stated that, in conducting this test, a court should consider factors such as: (1) police coercion; (2) length of interrogation; (3) location of interrogation; (4) continuity of interrogation; (5) the suspect's maturity; (6) the suspect's education; (7) the suspect's physical condition and mental health; and (8) whether the suspect was advised of *Miranda* rights. *Withrow v. Williams,* 507 U.S. 680, 693-94 (1993). Coercive police activity is a necessary element for finding that a confession was involuntary. *Colorado v. Connelly,* 479 U.S. 157, 167 (1986).

*Abela v. Martin*, 380 F.3d 915, 928 (6th Cir. 2004). Although Wiley notes the length of his interrogation and his ninth-grade education, his claim fails because there is no evidence of police coercion, as found by the district court.

At the suppression hearing, the magistrate heard testimony from the Defendants, Detective Rick McCubbin, Detective Larry Duncan, Detective Mark Handy, Detective Ray Patterson, and Detective Mark Hickman. The detectives testified that Wiley was read his Miranda rights at 12:57 p.m. He signed a Miranda waiver at 1:00 p.m., witnessed and co-signed by Detectives McCubbin and Handy. Later, during the interview, Detective Duncan again reviewed with Wiley his constitutional rights and had Wiley initial the form advising him of his rights. Detectives Duncan, Handy, Hickman and McCubbin all testified that Wiley never asked for an attorney.

Wiley claims that he asked to call a lawyer – a request refused by Louisville police. He also claims that he did not read the rights waiver form, instead relying upon Detective Handy's statement that the form was "waiving [his] rights." After hearing the testimony, the magistrate did not give credence to Wiley's claim that he had requested an attorney on several occasions, noting that "[a]ll the detectives involved in Wiley's interrogation consistently testified that Wiley

made no request for the presence of an attorney at any time following his arrest." He further found that Wiley acknowledged orally and in writing that he understood his *Miranda* rights. Finally, he noted that Wiley had previous experience with the criminal justice system and was admittedly familiar with his constitutional rights. After conducting a *de novo* review, the district court found no error in the magistrate's findings and adopted them as the court's findings. The findings that Wiley had: (1) been read his rights; (2) read and signed the Miranda waiver form; and (3) failed to request an attorney, are supported by the record and Wiley has failed to show these factual conclusions were clear error. *See United States v. Cruse*, 59 Fed. Appx. 72, 77 (6th Cir. 2003) (where defendant claimed he was not read his rights and was denied access to an attorney upon request, but police officers testified otherwise, court found that district court's decision to discredit the defendant's testimony was not clearly erroneous).

Wiley also argues that he was coerced into waiving his rights by the promise of a reduced sentence. Detectives Duncan, Handy, Hickman and McCubbin all testified that no promises had been made to Wiley concerning leniency or a reduced sentence. Detective Hickman, however, testified that someone else might have suggested to Wiley that he would be best served by confessing to all of his crimes at one time, because it would spare him multiple trials and might reduce his total sentence. Wiley claims that the detectives promised to talk to the prosecutor in order to help him receive a lighter sentence. He also maintains that he was promised a 10-year sentence for his cooperation.

The magistrate found that, while the detectives told Wiley that the police would inform the prosecutor of his cooperation, they did not promise Wiley a specific sentence. The magistrate noted that the detectives had no way of knowing what charges would be filed and did not hold the ultimate authority to determine Wiley's sentence. Further, the detectives testified that no one had promised Wiley a certain sentence, or even a range of sentences. Detective McCubbins simply testified that he might have told Wiley that, while cooperation helps, ultimately the plea-bargain decisions are left to the prosecutor. In addition, Detective Hickman testified that someone may have suggested that confessing to all of the robberies at once may result in a lower possible punishment. The district court's factual determination that the detectives did not promise Wiley a specific sentence is not clearly erroneous.

The magistrate further concluded, as a matter of law, that the detectives' promise to inform the prosecutor of Wiley's cooperation did not render his confession involuntarily coerced. This Court dealt with similar facts in a recent unpublished case:

> the only undisputed evidence of alleged coercion consists of Sergeant Hallenback's statements that Defendant would be brought into federal court and that the 5K1.1 motion was a possibility upon his cooperation with the government. Although "a promise of leniency is relevant to determining whether a confession was involuntary and, depending on the totality of the circumstances, may render a confession coerced," *Clanton v. Cooper,* 129 F.3d 1147, 1159 (10th Cir. 1997), a statement about possible leniency upon cooperation is not generally impermissible. *See Williams v. Withrow,* 944 F.2d 284, 289 (6th Cir. 1991) (acknowledging that some degree of "carrot-and-stick approach to eliciting information from an uncooperative suspect" is acceptable), *rev'd on other grounds,* 507 U.S. 680 (1993).

*Cruse*, 59 Fed. Appx. at 78 (internal citation omitted). Further, promises to inform a prosecutor of cooperation do not, *ipso facto*, render a confession coerced. *United States v. Shears*, 762 F.2d 397, 401-402 (4th Cir. 1985); *United States v. Robinson*, 698 F.2d 448 (D.C. Cir. 1983); *United States v. Curtis*, 562 F.2d 1153, 1154 (9th Cir. 1977), *cert. denied*, 439 U.S. 910 (1978); *United States v. Pomares*, 499 F.2d 1220, 1222 (2d Cir. 1974), *cert. denied*, 419 U.S. 1032 (1974); *United States v. Springer*, 460 F.2d 1344, 1347 (7th Cir. 1972). This is so, even when the promise to inform the prosecutor is "accompanied by a promise to request leniency or by speculation that cooperation will have a positive effect." *United States v. Guerrero*, 847 F.2d 1363, 1366 (9th Cir. 1988); *see also United States v. Westbrook*, 125 F.3d 996, 1005-1006 (7th Cir. 1997). Here, the detectives' alleged promise to inform the prosecutor of Wiley's cooperation did not render the confession coerced, even if the detectives suggested that such cooperation may have a positive impact on Wiley's sentence.

## II.    Hobbs Act Jurisdiction

Fletcher maintains that this Court should follow a stricter test than the traditional *de minimis* interstate commerce impact test for the establishment of federal jurisdiction under the Hobbs Act, 18 U.S.C. § 1951. If, however, the Court is inclined to follow the *de minimis* impact test, he argues that the United States failed to meet its burden for establishing that the robberies had a *de minimis* impact on interstate commerce.

In *United States v. Smith*, *supra*, this Court reviewed the *de minimis* impact test for Hobbs Act convictions in light of the Supreme Court's restriction of interstate commerce jurisdiction

in *United States v. Lopez*, 514 U.S. 549 (1995). The *Smith* Court reaffirmed that the "proper standard for Hobbs Act convictions is the long-standing *de minimis* effect on interstate commerce." *Smith*, 182 F.3d at 456. Fletcher, however, cites language from *United States v. Wang*, 222 F.3d 234, 240 (6th Cir. 2000), restricting Hobbs Act jurisdiction for robberies involving private citizens. The *Wang* Court, however, did not overrule the *Smith* Court's decision that the *de minimis* impact test survived *Lopez* (nor could it). Rather, *Wang* held that robberies of *private individuals* that have only a "speculative" effect on interstate commerce do not meet the requirements for federal jurisdiction under the commerce clause. *Id*. at 238-39. This Court recognized that in *Smith* "we decided that *Lopez* did not require realignment of the Hobbs Act's jurisdictional nexus because individual instances arising under the statute could, through repetition, have a substantial effect on interstate commerce" and that "[t]he Hobbs Act's *de minimis* standard survives *Lopez* by virtue of the aggregation principle." *Id*. This Court held, however, that "[p]er *Lopez,* a small sum stolen from a *private individual* does not, through aggregation, affect interstate commerce merely because the individual happens to be an employee of a national company, or happens to be on his way to a store, or happens to be carrying proceeds from a restaurant." *Id*. at 239 (emphasis added). Because the robberies in this case involved robberies of commercial businesses and not private citizens, the *de minimis* impact test would be applicable under both *Smith* and *Wang*.

Fletcher argues that, even if the *de minimis* impact test applies, the government failed to meet its burden of demonstrating a *de minimis* impact on interstate commerce. Trial testimony

produced the following evidence of the connection between the robberies and interstate

commerce:

> J.C.'s Cigarettes: items sold at the stores came from Illinois, Ohio, California, New York, and South Carolina. The store also has out-of-state customers, a fact gleaned from checking drivers' licenses for the sale of tobacco and liquor.

> Annie's Pizza received its business supplies from two different suppliers in Indiana. It also had out-of-state customers, including numerous truck drivers.

> Days Inn regularly had out-of-state guests, a fact learned from checking identification of arriving guests.

> The Hampton Inn estimated, from checking guest identification, that 90-95% of its guests were from out of state.

> McDonald's received its products from a supplier in Indiana and through an in-state supplier that received its goods from Illinois. Based upon license plates and discussions with customers, the store manager testified that the restaurant served out-of-state patrons.

> Diversa-Com had out-of-state customers.

> Subway's products came from "all over the country," including Indiana and Wisconsin.

> Powertel sold Nokia phones made in Finland and received its products from Georgia, Pennsylvania, and Washington.

In *Smith*, this Court found sufficient for purposes of federal jurisdiction, evidence

"proving that the stores Smith robbed did a substantial business in beer, wine, and tobacco

products and that virtually none of such products originate in Michigan." *Smith*, 182 F.3d at

456. Viewing the evidence in the light most favorable to the government, a rational trier of fact

could find beyond a reasonable doubt that Fletcher's activities had a *de minimis* impact on

interstate commerce. *Id.*

### III.     Severance Motion

Wiley argues that it was a clear abuse of discretion for the district court to deny his

motion to sever his trial from Fletcher's. Several days before the trial began the United States

discovered that prints on the vehicle involved in the final robbery came from Fletcher and

George Lee. No prints were found of Wiley. Due to the late disclosure, the district court did not

permit the United States to use this evidence against Fletcher. The court, however, allowed

Wiley to elicit testimony that none of the prints were his but, to protect Fletcher from the late

disclosure, it did not allow Wiley to have the prints identified as Fletcher's and Lee's.

Wiley claims that the district court's actions prejudiced him because he was not able to

inform the jury that Lee had a criminal history, including armed robbery, and that Lee was

acquainted with Fletcher. In denying the severance motion, the district court noted that:

> the Defendant has been afforded effective use of the evidence that his prints were
> not on the vehicle or could not be lifted from the vehicle or his prints were not
> identified from the vehicle, and . . . it is not necessary or appropriate in this matter
> that he identify whose prints they were as long as they can identify and prove to
> the jury that they were not his. His defense is that he was not guilty of the crime,
> so that evidence can be proven that he did not have prints there.

As this Court has noted previously,

> [a]s a general rule, persons jointly indicted should be tried together because there
> is almost always common evidence against the joined defendants that allows for
> the economy of a single trial. Severance should be granted only if there is a
> serious risk that a joint trial would compromise a specific trial right of one of the
> defendants, or prevent the jury from making a reliable judgment about guilt or

> innocence. The fact that a defendant may have a better chance at acquittal if his trial were severed does not require the judge to grant his motion: the defendant must show "substantial," "undue," or "compelling" prejudice.

*United States v. Lopez*, 309 F.3d 966, 971 (6th Cir. 2002) (citations omitted).

In this case, the district court's failure to allow Wiley to identify Lee and Fletcher as the source of the fingerprints found in the car did not amount to substantial, undue or compelling prejudice. Wiley was permitted to elicit testimony that his prints were not found. Further, during closing arguments, Wiley's counsel stressed that his prints had not been recovered from any crime scene. Clearly, the most damaging evidence to Wiley was his detailed confession. Testimony linking Lee to Fletcher and the robberies would have been of questionable value. Wiley still would have had to deal with his detailed confession. At best, the jury would likely have believed that Lee was somehow involved in Wiley and Fletcher's robbery spree. The district court's decision to deny the severance motion did not result in substantial prejudice and was not a clear abuse of discretion.

## IV. 3,184-Month Sentences

The district court imposed 100 months for each of the eleven Hobbs Act violations, with the sentences to run concurrently. For the violations of 18 U.S.C. § 924(c), the district court sentenced the Defendants to the mandatory minimum of seven years, for the first count, and the mandatory minimum of twenty five years, for the ten remaining 924(c) counts, to run consecutively, pursuant to 18 U.S.C. § 924(c)(1)(D)(ii). Thus, the sentences totaled 3,184 months (or over 265 years). Wiley makes two arguments regarding the sentence. First, it is

disproportionately severe. Second, he argues that the prosecutor's ability to "charge bargain" violates the separation of powers, the Defendants' due process rights and his Sixth Amendment right to trial by jury. Fletcher joins in the first argument.

### A. Eighth Amendment

The Defendants argue that their lengthy sentences, which are essentially life sentences, violate the Eighth Amendment. They note that in *Solem v. Helm*, 463 U.S. 277, 290-92 (1983), the Supreme Court identified three relevant criteria in reviewing a disproportionate punishment claim: (1) the nature of the crime and the punishment imposed; (2) the punishment for other offenses in this jurisdiction; and (3) the punishment for similar offenses in other jurisdictions. In *Harmelin v. Michigan*, 501 U.S. 957, 1004-1005 (1991), Justice Kennedy noted in a concurrence that *Solem* did not announce a rigid three-part test and stated that *Solem* "did not mandate such inquiries." One of the *Solem* factors alone may be sufficient to determine the constitutionality of a sentence. *Id.* In fact, a "reading of our cases leads to the conclusion that intrajurisdictional and interjurisdictional analyses are appropriate only in the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality." *Id.* at 1005. This conclusion was later echoed by the Court in *Ewing v. California*, 538 U.S. 11, 23 (2003), noting that "Justice Kennedy's concurrence also stated that *Solem* did not mandate comparative analysis within and between jurisdictions. The proportionality principles in our cases distilled in Justice Kennedy's concurrence guide our application of the Eighth Amendment. . . ."

Because several Supreme Court and Sixth Circuit cases have upheld punishments similar to those received by the Defendants, it is not necessary to undertake an extensive *Solem* analysis. In *United States v. Marks*, 209 F.3d 577, 581, 583 (6th Cir. 2000), this Court rejected an Eighth Amendment challenge for two defendants who were sentenced to 1,395 months for six armed robberies and 2,242 months for nine armed robberies. *See also United States v. Collins*, 61 F.3d 904 (table), 1995 WL 441622 at *3 (6th Cir. July 25, 1995) (rejecting an Eighth Amendment attack against a 627 month sentence for three armed robberies). In upholding the sentences in *Marks* and *Collins*, this Court cited the Supreme Court's decision to uphold a 105-year sentence for six armed bank robberies in *Deal v. United States*, 508 U.S. 129 (1993). In *Deal*, the Court did not specifically consider the case on Eighth Amendment grounds; rather, it was asked to consider whether multiple charges in the same indictment under § 921(c) qualify for the enhanced and consecutive nature of subsequent § 921(c)(1)(C) convictions. In concluding that multiple § 921(c) charges contained in a single indictment can trigger the provisions of § 921(c)(1)(C), however, the Court noted that:

> we need not tarry over petitioner's contention that the rule of lenity is called for because his 105-year sentence "is so glaringly unjust that the Court cannot but question whether Congress intended such an application of the phrase, 'in the case of his second or subsequent conviction.'" Br. for Pet. 24. Even under the dissent's reading of § 924(c)(1), some criminals whose only offenses consist of six armed bank robberies would receive a total sentence of 105 years in prison. We see no reason why it is "glaringly unjust" that petitioner be treated similarly here, simply because he managed to evade detection, prosecution, and conviction for the first five offenses and was ultimately tried for all six in a single proceeding.

*Id.* at 137.

The Eighth Amendment is "offended only by an extreme disparity between crime and sentence." *United States v. Hopper*, 941 F.2d 419, 422 (6th Cir. 1991). The Defendants' sentences of 3,184 months for committing eleven armed robberies in less than six weeks do not constitute an "extreme disparity between crime and sentence." As noted *supra*, both the Supreme Court and this Court have upheld similar sentences for similar crimes.

### B. Mandatory Minimum Sentences

Wiley also claims that mandatory minimum sentences impermissibly remove discretion from the judiciary and vest it in the executive, allowing manipulation of sentences through the use of "charge bargaining" and threats of federal prosecution. He also argues that their use violates due process by failing to consider the individual circumstances of his case and also that mandatory minimums violate his Sixth Amendment right to trial by jury by attempting to extract a plea bargain through coercive charging tactics. At oral argument, Wiley attempted to mold his arguments to conform to *United States v. Booker*, 542 U.S. ___, 125 S. Ct. 738 (2005), asserting that the lack of judicial discretion under a mandatory minimum sentencing scheme, coupled with his lengthy sentence, violated the Eighth Amendment.

While Wiley correctly notes that some jurists and commentators have discomfort with mandatory minimum sentences, this Court has upheld their application. *United States v. Dumas*, 934 F.2d 1387 (6th Cir. 1991); *cf. Mistretta v. United States*, 488 U.S. 361, 364 (1989) (Congress has power to fix sentence for federal crime and judicial discretion to determine sentences is subject to congressional control). In addition, *Booker* had no impact on statutory

minimum sentences and cannot be read for the proposition that statutory minimums are unconstitutional. Further, Wiley's sentence was based on individualized factors, *i.e.*, the number (eleven) and type (armed) of robberies he committed. In short, his sentence was severe because he was convicted of committing a series of separate and distinct serious crimes – eleven armed robberies.

Finally, there is absolutely no evidence that the United States sought to coerce a plea from Wiley by threatening federal prosecution, or engaged in any other type of "vindictive prosecution." *Bragan v. Poindexter*, 249 F.3d 476, 481-82 (6th Cir. 2001). Regardless, "a federal indictment obtained against one who has been threatened with federal prosecution for refusing to plead guilty to state charges is not subject to dismissal on grounds of 'vindictive prosecution.'" *United States v. Forrest*, 402 F.3d 678, 691 (6th Cir. 2005) (citation omitted); *see also Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978) ("While confronting a defendant with the risk of more severe punishment clearly may have a 'discouraging effect on the defendant's assertion of his trial rights, the imposition of these difficult choices [is] an inevitable' – and permissible – 'attribute of any legitimate system which tolerates and encourages the negotiation of pleas.'" (citation omitted)). Many crimes are punishable in either state or federal court. The decision to prosecute in federal court is vested in the sound prosecutorial discretion of the Attorney General. *See Wayte v. United States*, 470 U.S. 598, 607 (1985) (citations omitted) ("In our criminal justice system, the Government retains broad discretion as to whom to prosecute. So long as the prosecutor has probable cause to believe that the accused committed an offense

defined by statute, the decision whether or not to prosecute, and what charge to file or bring

before a grand jury, generally rests entirely in his discretion.  This broad discretion rests largely

on the recognition that the decision to prosecute is particularly ill-suited to judicial review.").

## CONCLUSION

Accordingly, we **AFFIRM** the judgment of the district court.