NOT FOR PUBLICATION
File Name: 08a0114n.06
Filed: February 21, 2008

Nos. 06-3237; 06-3267

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

       Plaintiff-Appellee,

                              ON APPEAL FROM THE
v.                             UNITED STATES DISTRICT
                                COURT FOR THE NORTHERN
GARY DEE ERVIN;              DISTRICT OF OHIO
AUBREY WALLER,

       Defendants-Appellants.

_____/

BEFORE:  SUHRHEINRICH and ROGERS; Circuit Judges; and BELL[*] District Judge.

     SUHRHEINRICH, Circuit Judge.

I.

This appeal involves conspiracies to commit Hobbs Act robberies in Cincinnati, Ohio, and

Toledo, Ohio, and related firearms charges.  Defendants Gary Dee Ervin and Aubrey Waller appeal

their convictions and sentences following a jury trial.  We AFFIRM.

II.

A.

On March 10, 2003, three men robbed at gunpoint the Richter and Phillips jewelry store,

located at Sixth and Main, in Cincinnati, Ohio.  The robbers took jewelry and Rolex watches,

_____

[*]The Honorable Robert Holmes Bell, Chief Judge, United States District Court for the
Western District of Michigan, sitting by designation.

resulting in a loss of $650,000 in retail goods. Two of the robbers smashed the glass display cases with sledge hammers and stole the merchandise while the third robber used a handgun to control the premises.

On April 28, 2003, the Harold Jaffe Jewelers, 5055 Monroe Street, Toledo, Ohio, was robbed. Approximately forty-two Rolex watches, valued in excess of $400,000, were stolen.

Meanwhile, on November 3, 2003, a Mann's jewelry store in Brighton, New York, was robbed. An individual named Eric Ramsey, aka "E-Rock," was charged in early 2004 by the New York state police. Ramsey pleaded guilty to that state offense and was sentenced to a twenty-year term. Thereafter, Ramsey agreed to cooperate and to plead guilty to conspiracies to commit jewelry store robberies in Cincinnati, Ohio; Toledo, Ohio; and Indiana, in exchange for a recommendation that he receive a fifteen-year federal prison term to be served concurrently with his twenty-year state sentence.

Ramsey testified that he had acquired expertise in robbing jewelry stores and that he "hooked up" with codefendant Cleveland Howard, aka "Tuffy." In March of 2003, Ramsey, Howard, Howard's girlfriend Rebecca Ward, Tom Robertson, and Defendant Ervin left Cleveland for Cincinnati to rob the Richter and Phillips jewelry store. The conspirators stayed in a motel several days prior to the robbery. Ramsey visited the store to determine where the Rolex watches and diamond rings were located.

On March 10, 2003, Ramsey, Robertson, and Ervin drove to the jewelry store. Robertson had a gun and a can of mace. His job was to ensure that no one moved or used the telephone. Ramsey broke two glass cases with a sledgehammer. Ervin also had a sledgehammer, which he

2

used to smash the case containing earrings. After filling two pillow cases with merchandise, the three left the store.

The conspirators sold the jewelry in Cleveland. The haul netted $130,000. Ervin and Robertson received $5,000 each the next day.

At trial, Ramsey identified himself, Robertson, and Ervin robbing the Richter and Phillips store in surveillance photo exhibit 6G. He also identified Ervin in court as being one of the robbers of that store.

Ramsey further testified that in April 2003, he and Howard, Ward, Defendant Waller, Ervin and James Anderson robbed the Jaffe Jewelry store in Toledo, Ohio. Again, the coconspirators spent several days in a local motel while they planned the robbery. Waller was assigned the job of stealing a car for the robbery. Ward testified that she drove Waller to a K-Mart parking lot, where he stole a car. Ramsey stated that on the day of the robbery, he drove Waller, Ervin, and Anderson to the jewelry store. Waller and Anderson carried nine millimeter handguns while Ramsey and Ervin took hammers and pillow cases from the motel room. Waller and Anderson controlled the people in the store, while Ramsey and Ervin stole the Rolex watches. Ramsey identified a surveillance photo of a robber with a gun in the jewelry store as Aubrey Waller. He further identified a surveillance photo of the four of them in the jewelry store.

The conspirators returned to Cleveland with the jewelry and sold it.

Ward also testified. She stated that she knew both Ervin and Waller for several years from the neighborhood. She admitted going to Cincinnati in March 2003 to rob the jewelry store with Ramsey, Robertson, Ervin, and Howard. Ward also testified that she traveled to Toledo with

3

Howard, Waller, Ervin, Anderson, and Ramsey, and that at that time a plan was devised to rob the Richter and Phillips jewelry store. Ward also testified that after the robbery, she saw Waller with a handgun.

Similarly, Howard admitted to conspiring with Ward, Robertson, Ramsey, and Ervin to drive to Cincinnati to rob a jewelry store. Howard corroborated Ramsey's and Ward's recitation of events. Howard also corroborated Ramsey's testimony that he conspired with Ramsey, Ervin, Waller, and others to rob the Toledo jewelry store. Howard identified Ervin and Waller in court.

**B.**

On May 24, 2004, a federal grand jury returned an eight-count indictment against Ervin and Waller. Ervin was charged with one count of conspiracy to commit a robbery and obstructing and delaying interstate commerce in connection with the Cincinnati robbery on March 13, 2003, in violation of 18 U.S.C. §§ 1951(a) and 371 (Count 1); one count of constructive possession of a firearm during the course of that robbery, in violation of 18 U.S.C. § 924(c)(1)and (2)(Count 2); one count of conspiracy to commit a robbery in connection with the Toledo robbery on April 20, 2003 (Count 3); and one count of carrying a firearm in connection with that robbery (Count 4). Waller was charged with one count of conspiracy to commit a robbery in connection with the Toledo robbery on April 20, 2003 (Count 3); and one count of carrying a firearm in connection with that robbery (Count 4). The two were tried together before a jury. The jury found both defendants guilty of all counts charged.

On January 12, 2006, Waller was sentenced to a total term of 360 months: 60 months on Count 3 and 300 months on Count 4, to be served consecutively. Ervin was sentenced to a total term of 660 months: 60 months on Count 1; 60 months on Count 3, to be served concurrently with each

4

other; 300 months on Count 2 to be served consecutive to the sentence on Counts 1 and 3; and 300 months on Count 4 to be served consecutive to the sentence imposed in Counts 1, 2, and 3.

Both Defendants filed timely notices of appeal.

### III.

Ervin raises five issues on appeal; Waller raises one, which corresponds to Ervin's fifth issue.

### A.

Ervin alleges that the trial court committed reversible error when it denied his *Batson* challenge. The government struck one of three African-Americans and four women from the venire. Ervin objected on the bases of race and gender pursuant to *Batson v. Kentucky*, 476 U.S. 79 (1986). The district court rejected the challenge, noting that eighteen out of thirty-three in the group were women and that six of the twelve jurors chosen were women. Additionally, a woman was also an alternate. Further, while one African-American male was struck, two African-Americans were not struck and served on the jury. The trial court therefore specifically concluded that Ervin had not made out a prima facie showing of a *Batson* violation.

To establish that a prosecutor has violated the Equal Protection Clause in his or her exercise of peremptory challenges, a defendant must first establish a prima facie case of discrimination. To create an inference of discrimination, the defendant must first show that he is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove members of his race from the venire. He must then show that these facts and other relevant circumstances raise an inference that the prosecutor used peremptory challenges to exclude veniremen on account of race. *Batson*, 476 U.S. at 96. Once the defendant has made this showing, the burden shifts to the prosecutor to provide a race-neutral explanation for the peremptory

5

challenges. Finally the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. *Id.* at 96-98.

The *Batson* rule also applies to gender classifications. *J.E.B. v. Alabama ex rel. J.B.*, 511 U.S. 127 (1994).

An inference of discrimination may be raised if there was a pattern of strikes against jurors of either a particular race or gender. *See id.* The racial and gender composition of the initial group seated and the final jury panel sworn is also relevant. *United States v. Sangineto-Miranda*, 859 F.2d 1501, 1520 (6th Cir. 1988).

Ervin's racial challenge fails. The district court found that while one African-American male was struck, two African-Americans were not struck and served on the jury. These facts do not provide a basis upon which to infer discriminatory motive.

Ervin further relies on the fact that the percentage of women in the venire was 56%; the percentage of women in the actual jury was 50%. We do not see this difference as constitutionally significant, especially when one factors in the alternate juror. *See id.* at 1521 (stating that, if the percentage of minority members in the ultimate jury is the same or greater than the percentage of minority members in the jury pool, that would be a factor tending to negate the inference of discrimination). *Cf. United States v. Walton*, 908 F.2d 1289, 1298 (6th Cir. 1990) (holding that the defendant had not made a prima facie showing that the strikes were racially motivated where the prosecutor had two unused peremptory challenges and the final composition of the jury had a higher percentage of black members than the initial jury pool). Since Ervin fails to present other "relevant circumstances" to raise an inference of discrimination, *see Sangineto-Miranda*, 859 F.2d at 1520-21, our inquiry is over. Furthermore, since Ervin failed to establish "this burden-shifting step[,] . . . the

only issue for review is whether the district court erred in determining there was no prima facie case shown." *Id.* at 1520.

Notwithstanding, Ervin further argues that the district court erred in failing to address each step of the *Batson* test, because the government offered race-neutral explanations for the peremptory challenges. He cites *Hernandez v. New York*, 500 U.S. 352 (1991), which held that once the prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of intentional discrimination becomes moot." *Id.* at 359. In *Hernandez*, the prosecutor defended his use of peremptory strikes without any ruling from the trial court. *Id.* "As a result, the trial court had no occasion to rule that petitioner had or had not made a prima facie showing of intentional discrimination." *Id.*

However, that is not the situation in this case. Here, the district court clearly ruled that Ervin had not made a prima facie showing, but it invited the government, if it wished, "to address the issue anyway, assuming that [the] prima facie case had been made." Thus, because the trial court found no *prima facie* case of discrimination, which is not erroneous, there is no need for further review.

Further, "assuming that a *prima facie* case had been made," the trial court found the government's explanations sufficient to rebut the presumption and establish that there was no bias on the basis of race or sex. Thus, the court accepted the government's explanations that juror No. 8, an African-American male, was dismissed because he mentioned the word "government" twice in his answers and the government was concerned that he would not be sympathetic to its position. Juror No. 14 was struck because the government was concerned that as a drama teacher dealing with troubled youths, she might be too sympathetic to the defense. Juror No. 15 was struck because her

7

son (not the juror herself, as mistakenly stated by the government) was bipolar, and she indicated that she had difficulty concentrating. Juror No. 11 had been the victim of a crime, and the government felt that she had some issues regarding judgment. Also, she had been "very forgiving" of the fact that she had been the victim of a crime thirty-four years earlier. The court's alternate ruling was not clearly erroneous. *Valentine v. United States*, 488 F.3d 325, 338-39 (6th Cir. 2007), *petition for cert. filed* (Jan 03, 2008)(NO. 07-8640).

**B.**

Next, Ervin argues that the trial court erred in failing to grant his motion for judgment of acquittal because the evidence was insufficient to convict him of Counts 3 and 4, pertaining to the Toledo robbery. This Court assesses the evidence in the light most favorable to the government and determines whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The denial of a motion for judgment of acquittal is reviewed de novo. *United States v. Talley*, 194 F.3d 758, 764 (6th Cir. 1999).

Specifically, Ervin claims that the government failed to prove element two, that he willfully became a member of a conspiracy to engage in the Toledo store robbery. He further contends that it is legally insufficient to credit the testimony of co-conspirators who received reduced sentences for their testimony. Relatedly, Ervin argues that the court improperly admitted co-conspirator statements in violation of this Circuit's procedure known as the "*Enright* finding." *See United States v. Enright*, 579 F.2d 980, 985-87 (6th Cir. 1978). Under the *Enright* test, before a statement by a co-conspirator can be admitted as non-hearsay pursuant to Fed. R. Evid. 801(d)(2)(E), the party offering it must show by a preponderance of the evidence that (1) the conspiracy existed; (2) the defendant

8

was a member of the conspiracy; and (3) the co-conspirator's statements were made in furtherance of the conspiracy. *See United States v. Wilson*, 168 F.3d 916, 920 (6th Cir. 1999).

In the first place, Ervin's reliance on *Enright* is misplaced, because the government did not rely on testimony from non-testifying co-conspirators. Instead, it relied on three live witnesses who identified Ervin in court as a co-participant in the Toledo robbery. Ramsey identified Ervin as "Wheezy." Ramsey testified that just prior to the robbery he drove in a van to Toledo with Howard, Ward, Waller, Ervin, and Anderson to rob a jewelry store. Ramsey stated that Ervin, along with the others, cased the jewelry store prior to the robbery. Ramsey stated that on the day of the robbery, he drove the stolen car to the jewelry store and that Waller, Ervin, and Anderson were with him. Ramsey and Ervin carried hammers. Waller and Anderson were armed with nine millimeter semi-automatic firearms. Ramsey testified that once in the store, he and Ervin broke open the Rolex case and took watches. Ramsey identified Exhibits 19 and 19E-F, surveillance photographs and video clip from the surveillance cameras at the Toledo jewelry store, as showing himself, Anderson, Ervin, and Waller during the robbery. Ramsey explained that Ervin returned to Cleveland along with some of the others and the stolen jewelry in Ward's van. Ervin received some of the proceeds from the sale of the stolen jewelry.

Coconspirators Ward and Howard also identified Ervin. Ward stated that she had known Ervin for six years before the robbery, and she identified him in the courtroom. Ward testified that in April, 2003, she traveled with Ramsey, Howard, Waller, Ervin, and Anderson in a van to Toledo. Ward explained that she was present while the others were planning the robbery. This included the fact that Ervin was supposed to "bust[] cases."

9

Howard also knew Ervin, and he identified him in court. Howard testified that in April, 2003, he traveled to Toledo in a van with Ward, Ramsey, Waller, Ervin, and Anderson, to rob a jewelry store. Ervin's job was to smash the glass cases and put the jewelry into pillow cases. Howard indicated that two firearms were involved in the Toledo robbery.

The testimony of Ramsey, Ward, and Howard, construed in the light most favorable to the government, is sufficient to establish that Ervin was a member of the conspiracy to rob the Toledo jewelry store. Their testimony reflects "[a]n agreement or understanding between two or more of the defendants" including Ervin. *See United States v. Henley*, 360 F.3d 509, 513 (6th Cir. 2004). Contrary to Ervin's assertion, "it is well-settled that uncorroborated testimony of an accomplice may support a conviction in federal court." *Id.* Here we have the testimony of three accomplices, and their testimony largely corroborated each other's. Further, Ervin's contention that their testimony is legally insufficient because they received plea agreements is also incorrect, as this asks us to weigh the credibility of the witnesses. *Id.*

There is likewise sufficient evidence to sustain the conviction on Count 4. This Court has held that to sustain a conviction under § 924(c) for aiding and abetting, the government must prove "that the defendant, as the accomplice, associated and participated in the use of the firearm in connection with the underlying . . . crime." *United States v. Franklin*, 415 F.3d 537, 554-55 (6th Cir. 2005). The government meets this burden by showing that the defendant both knew that the principal was armed and acted with the intent to assist or influence the commission of the underlying predicate crime. *Id.* Based on the evidence, the jury easily inferred that Ervin knew that his co-conspirators used firearms during the robbery. The evidence reflected that Ervin was associated with the conspirators as an accomplice and participated in the underlying crime.

**C.**

Next, Ervin asserts that the trial court committed plain error by depriving him of his right to make an informed decision to go to trial and waive the plea offer. Ervin had a prior federal conviction, which included a § 924(c) count. *See United States v. Ervin*, 209 F. App'x 519 (6th Cir. 2006), *cert. denied*, 127 S. Ct. 2151 (2007) (unpublished). The effect of this conviction was to make any subsequent § 924(c) conviction punishable by a statutory mandatory sentence of twenty-five years to run consecutively with any other counts of conviction. *See* 18 U.S.C. §§ 924(c)(1)(C)(i) and (c)(1)(D)(ii).

Prior to trial, the court asked the government to extend to Ervin an opportunity to discuss possible plea agreements. The government represents in its brief that "[t]here was discussion between the government and Ervin's counsel about . . . a potential agreement," and at oral argument government counsel indicated that he told counsel that Ervin could plead to a § 924(c) count, and that the government apparently would have dropped the second § 924(c) charge. Thus, Ervin would have ended up with only one 25-year consecutive sentence.

The trial court stated in relevant part that "with a 46-year sentence [from the prior federal conviction] . . . if you are convicted on a conspiracy, that would be up to five years. That's the max for conspiracy, but on top of the five years would be currently a 25-year sentence if you are convicted of a 924(c) count, the gun count." Ervin claims on appeal that he took this to mean that he was facing 25 years if he pled or 25 years if he was convicted, when in fact, if convicted of both § 924(c) counts (Counts 2 and 4), he would be facing two consecutive 25-year sentences. Thus, he had nothing to lose by going to trial. Now, Ervin will serve 55 years for the convictions in this case on

11

top of the 46 years from the prior convictions, for a total effective sentence of 101 years. Had Ervin accepted the purported plea offer, his sentence would have been 30 years plus the 46 years, for a total of 76 years.

As an initial matter, it is not clear from the transcript that the trial court's statement could have actually misled Ervin into believing that he had nothing to lose by going to trial. The court stated that Ervin would face a concurrent 25-year sentence for conviction of "a 924(c) count, the gun count." The statement does not necessarily indicate that Ervin faced only one 924(c) charge as a consequence of going to trial. Moreover, any confusion in this regard was unwarranted given the terms of the indictment. The indictment clearly charged Ervin with two 924(c) counts, and Ervin and his counsel were aware–or certainly should have been aware–that by going to trial and not accepting the government's offer to drop a 924(c) count, Ervin was exposing himself to two concurrent 25-year sentences instead of one. To the extent that Ervin may have been confused regarding the consequences of his choice to not plead guilty, that confusion involves an issue of ineffective assistance of counsel, not trial court error. That claim can be raised in a motion under 28 U.S.C. § 2255 and, given the state of the record, we think that to be the most prudent course of action.

**D.**

Ervin also argues that the trial court committed plain error in failing to find that the evidence established only one conspiracy instead of two, thus erring in failing to submit the question of single or multiple conspiracies to the jury. He alleges that there was simply "one, long term objective set forth by leaders of the conspiracy: to rob jewelry stores and acquire Rolex watches and diamond jewelry." (Ervin's Br. at 48.) This matters because had there been only one conspiracy charged,

12

Ervin would have been subject to only one § 924(c) conviction. *See United States v. Sims*, 975 F.2d 1225, 1235-36 (6th Cir. 1992). However, multiple consecutive sentences are required where the underlying crimes are separate. *See United States v. Burnette*, 170 F.3d 567, 571-72 (6th Cir. 1998) (holding that consecutive sentences for § 924(c) violations were appropriate where the kidnaping occurred significantly before, and independent of, the actual bank robbery).

As this Court stated in *United States v. Smith*, the key factors in determining the number of conspiracies "are the existence of a common goal, the nature of the scheme, and the overlapping of the participants in various dealings." *United States v. Smith*, 320 F.3d 647, 652 (6th Cir. 2003). The question of single or multiple conspiracies is usually a fact question, and is to be considered on appeal in the light most favorable to the government. *Id.*

As Ervin concedes, because he did not object below, a plain error standard of review applies. There is none in this case. Ramsey and Howard recruited different people on separate occasions to agree to travel together to commit the robberies. The robberies occurred in different locations, far apart in location and time, and the proceeds were disbursed after each robbery. Ervin was paid $5,000 for the Cincinnati robbery and an undisclosed amount to commit the Toledo robbery. While none of these factors is dispositive, *see United States v. Rios*, 842 F.2d 868, 873 (6th Cir. 1988) (per curiam) (noting that "a single conspiracy does not become multiple conspiracies simply because of personnel changes") (citation omitted), at the same time, viewed in a light most favorable to the government and reviewed under a plain error standard, a jury could have concluded that this was a multiple conspiracy. *See United States v. Hughes*, 895 F.2d 1135, 1140 (6th Cir. 1990) (holding that whether a single or multiple conspiracy exists is a question of fact). *See also Rios*, 842 F.2d at 872 (stating that this determination, in the light most favorable to the government, must be made without

13

weighing the evidence or determining witness credibility). Contrary to Ervin's suggestion, the evidence of the two robberies did not establish a "chain" conspiracy, because the two robberies were not interdependent on each other. *Cf. Smith*, 320 F.3d at 652-53 (holding that the evidence supported a single conspiracy where there was proof that the defendants knew of and agreed to participate in a single overarching conspiracy to extort money from banks where, in addition to an identical *modus operandi* and overlapping participants, in the months between the robberies the conspirators regularly associated with each other and money from the first extortion was used to purchase equipment for the second extortion). *See generally United States v. Warner*, 690 F.2d 545, 549 (6th Cir. 1982).

**E.**

Ervin claims that his sentence is disproportionate to his crime, and therefore cruel and unusual. This Court reviews de novo a constitutional challenge to a district court's sentence. *United States v. Marks*, 209 F.3d 577, 583 (6th Cir. 2000). Waller also argues that his sentence is cruel and unusual; however, since he failed to raise this claim below, the sentence is reviewed for plain error.

Ervin contends that his 660-month sentence is unjust because he was not the "mastermind," was not paid much money, and did not actually possess the firearms during the robberies. Waller claims his ultimate sentence of 360 months, 300 of which must be served consecutively to the 57 year sentence imposed on the basis of his prior convictions, is also unjust. Waller was sentenced to 60 months on Count 3, a violation of § 371, conspiracy (interference with commerce by threats or violence). Because Waller had been previously convicted of two violations for use of a firearm during the commission of a crime of violence, in violation of § 924(c)(1) (namely, carjacking and attempted murder of a federal officer), he was sentenced to 300 months on Count 4, to be served

14

consecutively to the 57-year sentence which was imposed on his prior convictions (totaling 84 years). Waller seeks a remand to allow the district court to run his sentence concurrently.

The Supreme Court has held that only those "extreme sentences that are grossly disproportionate to the crime are prohibited" by the Eighth Amendment. *United States v. Flowal*, 163 F.3d 956, 963 (6th Cir. 1998) (quoting *Harmelin v. Michigan*, 501 U.S. 957, 995-97 (1991)). *See also Ewing v. California*, 538 U.S. 11, 28 (2003) (reaffirming its holding in *Harmelin*). Stated differently, "strict proportionality between a crime and its punishment is not required." *Marks*, 209 F.3d at 583 (citing *Harmelin*, 501 U.S. at 959-60). As compared with both Supreme Court and this Circuit's precedent, the sentences in this case do not violate the Eighth Amendment. *Cf. Ewing*, 538 U.S. at 28 (holding that sentence of 25 years to life for shoplifting offense was not unconstitutionally disproportionate); *Harmelin*, 501 U.S. 959-60 (holding that Michigan's penalty of life imprisonment without parole for more than 650 grams of cocaine did not violate the Eighth Amendment); *United States v. Beverly*, 369 F.3d 516, 536 (6th Cir. 2004) (upholding sentence of 71 1/2 years for a cooperating defendant with no criminal record who drove a getaway car in four bank robberies and provided false identification); *United States v. Marks*, 209 F.3d 577 (6th Cir. 2000) (upholding a sentence of 2242 months where the defendant was involved in nine bank robberies, and a sentence of 1395 months involvement in six armed robberies); *United States v. Willis*, 232 F. App'x 527 (6th Cir. 2007) (holding that the defendant's sentence of 1920 months or 160 years, for seven counts of armed robbery and seven counts under § 924(c) was not unconstitutional); *United States v. Savoca*, 166 F. App'x 183 (6th Cir. 2006) (per curiam) (holding that 927 months' imprisonment for four bank robberies and two counts of § 924(c) was not unconstitutional); *United States v. Wiley*, 132 F. App'x 635 (6th Cir.) (unpublished) (holding that 3184 month sentence (over 265 years) imposed for eleven

counts of armed robbery and eleven counts of § 924(c) which occurred in less than six weeks was not unconstitutional), *cert. denied*, 546 U.S. 995 (2005); *United States v. Legette-Bey*, 147 F. App'x 474 (6th Cir. 2005) (unpublished) (holding that 154 years' imprisonment for six bank robberies and related firearms charges was not cruel and unusual under the Eighth Amendment). *See also United States v. Walker*, 473 F.3d 71 (3d Cir. 2007) (holding that the defendant's 55-year consecutive mandatory minimum sentences for three violations of § 924(c)(a) did not violate the Eighth Amendment cruel and unusual punishment clause). *See generally Deal v. United States*, 508 U.S. 129 (1993) (holding that Congress intended the mandatory terms of 20 years for each second and subsequent offenses required by § 924(c)(1)(C)(i) be imposed even if all of the offenses were charged in the same indictment). Most recently, this Court rejected a defendant's claim that his sentence of 1772 months for six armed robberies and six firearms offenses under § 924(c) was cruel and unusual, noting that "[t]his circuit has never held that the consecutive-sentence requirement in § 924(c) is unconstitutional," and further observing that this court has also imposed lengthy sentences in similar cases. *United States v. Watkins*, 509 F.3d 277, 282-83 (6th Cir. 2007) (and cases cited therein).

## IV.

For the foregoing reasons, Ervin's and Waller's convictions and sentences are **AFFIMED.**