RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 11a0039p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

UNITED STATES OF AMERICA,
                          *Plaintiff-Appellee,*

                                                  No. 08-6451
        *v.*

TERENCE STOKES,
                          *Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 06-20341-001—Samuel H. Mays, Jr., District Judge.

Argued: January 21, 2011

Decided and Filed: February 7, 2011

Before: ROGERS, SUTTON, and McKEAGUE, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** L. Daniel Johnson, Memphis, Tennessee, for Appellant. Tony R. Arvin,
ASSISTANT UNITED STATES ATTORNEY, Memphis, Tennessee, for Appellee.
**ON BRIEF:** L. Daniel Johnson, Memphis, Tennessee, for Appellant. Tony R. Arvin,
ASSISTANT UNITED STATES ATTORNEY, Memphis, Tennessee, for Appellee.

_____

**OPINION**

_____

ROGERS, Circuit Judge. Terence Stokes appeals his judgment of conviction on
two counts of bank robbery, in violation of 18 U.S.C. § 2113(a), and two counts of
brandishing a firearm during the commission of a crime of violence, in violation of
18 U.S.C. § 924(c). Stokes argues that there was insufficient evidence to support a jury
verdict of guilty. He also asserts that the district court improperly denied his motion to
suppress evidence, which was premised on the claims that his warrantless arrest was a

1

Fourth Amendment violation and that his confession was involuntary due to police coercion. Because there was sufficient evidence for a reasonable jury to find Stokes guilty, because his arrest was justified by the consent exception to the warrant requirement, and because his confession was not involuntary, Stokes is not entitled to appellate relief.

Stokes was indicted for robbing three Memphis banks with the use of a firearm. A jury ultimately found him guilty of two of the robberies, both of the same branch of Trust One Bank. In all three robberies, the perpetrator entered the bank wearing a mask or hat and carrying a pillowcase with a heavy object in the bottom. Witnesses in each robbery described the perpetrator as a dark-skinned male, between 5'11" and 6' tall, and between 200 and 250 pounds. In the last of the three robberies (of which Stokes was not convicted) the robber fired a shot inside a branch of the Regions Bank. The police did not release information about the shot to the media.

The robberies were investigated by members of the Memphis Police Department's Safe Streets Task Force. Stokes came to the investigators' attention after a police informant led officers to Stokes's co-defendant, Casanyl Valentine, who was trying to sell dye-stained cash in the Memphis area. Because cash taken in the robberies had been given to the robber with dye packs that would later explode, investigators believed the person selling the cash would have information about the crimes. Officers arrested Valentine, who did not meet the physical description of the perpetrator in the three robberies. Valentine told the officers that he hired people to carry out bank robberies for him. Valentine gave officers details of the three robberies, describing the location and procedure of each, and mentioning that a shot had been fired in one robbery.

Valentine told police that all three robberies had been carried out by Stokes. Investigators then pulled a booking photo of Stokes and compared it to a surveillance photo from one of the robberies. The officers concluded that the photos matched. They also showed the booking photo to Valentine, who confirmed that it depicted the person he had hired to carry out the robberies. Valentine told the investigators the address of a Memphis rooming house in which Stokes lived.

After talking with Valentine about Stokes, several officers went to the rooming house, arriving around 11:00 p.m. or midnight. These officers included Sergeant Pearlman, with the Memphis Police Department, and FBI Special Agent Bill Kay, who worked with the Safe Streets Task Force. Both Pearlman and Kay testified at the suppression hearing. Sergeant Pearlman testified that the officers arrived at the rooming house, went to Stokes's room, and knocked on the door. Pearlman testified that a woman opened the door of Stokes's room, and that the officers identified themselves as part of the Safe Streets Task Force and asked if they could enter. Pearlman testified that the woman gave consent for their entry. Sergeant Pearlman reported that Stokes could be seen sleeping in a recliner when the woman opened the door. Pearlman could not remember the woman's name, but stated on cross-examination that she identified herself as Stokes's girlfriend. Kay testified that the officers asked the woman how she knew Stokes. Neither Pearlman's nor Kay's testimony made clear whether they asked the woman about her relationship to Stokes before or after she granted them access to the room. The officers testified that their time at the rooming house was limited to an arrest and search incident to arrest. They further testified that after Stokes was arrested, he was placed in a police car to be taken to a nearby police building, the Project Safe Neighborhood (PSN) office, for interrogation. Kay testified that Stokes gave the officers information about the crimes only after they had arrived at PSN and Stokes had received his Miranda rights orally and in writing.

At the suppression hearing, Stokes gave a very different account of the officers' conduct at the rooming house. Stokes testified that he was smoking crack cocaine while lying in bed with a woman, whom he identified as a prostitute, when a dozen officers entered his apartment by unlocking the door. Stokes claimed the officers were all pointing their guns at him and that the officers asked: "where is the gun." He further testified that the officers searched the room and found crack cocaine and that one officer threatened that another, very large, officer would beat Stokes up if he didn't help them. Stokes also claimed that the officers promised him they would talk to the prosecutor to try to get him help, and that he told the officers, while still at the rooming house, that there was a gun at Valentine's girlfriend's house in Cordova. Stokes testified that he

was then handcuffed and placed in an SUV, at which point he gave the officers directions to the house in Cordova where they recovered cash and a gun. He testified that after leaving the Cordova house, he directed the officers to a parking lot where he had left a getaway car used in one of the robberies. Stokes testified that he was not given Miranda warnings in the course of these events.

On appeal, the parties agree that Stokes was interviewed at the PSN office until 5:08 a.m., at which point the officers started taking his written statement. Because Stokes appeared tired, the officers decided to take a break. Questioning resumed at 5:10 p.m., at which time Stokes completed and reviewed his written statement. Although Stokes's testimony provided a coherent account of the circumstances surrounding his arrest, he did not relate a clear story with regard to his statement. When testifying about when he made his statement, Stokes said: "I don't remember a lot of things . . . I was like out of my mind . . . I had been doing dope all that day, and I was full of dope then."

Stokes filed a pre-trial motion to suppress in which he argued that his arrest was illegal and that his statements, which amounted to a confession, were given under duress and thus involuntary. Stokes sought suppression of all evidence seized and statements made as a result of his arrest. The district court found the officers' testimony credible and Stokes's testimony inconsistent. The court denied Stokes's motion to suppress, finding that the "police were objectively reasonable in believing that the adult woman who answered the door at approximately 11:00 p.m. had actual authority to grant consent to enter," and that Stokes's confession was voluntary.

At trial, the Government called four witnesses: Sarah Britt, a Trust One teller who had been present during both of that branch's robberies; Justin Levick, an assistant vice-president of Trust One; FBI Special Agent Kay; and Teresa Thomas, a teller who was present during the robbery of Regions Bank. Britt and Kay both provided testimony relevant to the identity of the Trust One robber. In particular, Kay testified regarding Stokes's confession to the crimes.

On appeal, Stokes claims that there was insufficient evidence presented at trial to support his conviction. More specifically, Stokes contends that the evidence does not

"sustain a finding that [Stokes] committed the crimes in question." This claim is unavailing because the jury could reasonably rely on the testimony of Sarah Britt and on the evidence of Stokes's own confession to conclude that Stokes was the robber. *See United States v. Lawrence*, 391 F. App'x 480, 483 (6th Cir. 2010).

Stokes's brief presents several arguments for why Britt's identification was not reliable. However, Britt's testimony provided the jury with several reasonable grounds for relying on her identification. Therefore, taking the evidence in the light most favorable to the prosecution, Britt's testimony could support a reasonable jury's finding that Stokes carried out the Trust One robberies. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Stokes identifies the following weaknesses in Britt's identification: the robber's face was covered during the first robbery and partially obscured by sunglasses in the second; Britt testified that she knew it was the same man in both robberies only from his voice, but she had not heard his voice since the robberies; Britt identified someone other than Stokes as resembling the robber in a photographic line up she was shown in the weeks following the robbery (this line up did not contain a photo of Stokes); the robbery was a very stressful and short experience for Britt, thereby decreasing the credibility of her recollection; roughly two years had elapsed since the bank robberies at the time Britt identified Stokes in the courtroom; and Stokes was the only person in the courtroom who could come close to matching the robber's physical description. However, Stokes acknowledges that Britt's testimony was not tainted by any constitutional violation, and his attorney was able to point out each of these weaknesses during cross examination.

Further, Britt's testimony provided the jury with ample grounds for relying on Britt's identification to conclude that Stokes had committed the robberies. Britt detailed the robberies at some length, and stated that she had walked the robber from drawer to drawer in the bank and followed him as he left the branch in order to read the license plate numbers of the getaway vehicles. She also testified that she was able to see the robber's face during the second robbery, and that it was clearly the same man who had previously robbed the bank based on his voice alone. Britt also stated that the two

robberies were carried out in a similar fashion, further supporting her testimony that the same perpetrator committed both crimes. This testimony, taken in the light most favorable to the government, supports the conclusion that Stokes committed the robberies.

In addition to Britt's detailed testimony, the jury also heard testimony from Agent Kay that Stokes had confessed to committing both robberies, evidence that strongly supports the jury's guilty verdict. Stokes does not argue that the evidence of his confession does not support a conviction or that the jury gave the confession too much weight. Rather, he contends that the confession never should have been admitted and therefore should not be considered when reviewing the sufficiency of trial evidence. This claim is flawed, however, because sufficiency of the evidence claims are analyzed by examining all of the evidence admitted, regardless of the merits of any challenges to the admission raised in the same appeal. *See Patterson v. Haskins*, 470 F.3d 645, 651-53 (6th Cir. 2006). If this court finds that the admitted evidence was sufficient to support a conviction, the court will then proceed to examine any claims that might lead to a remand for retrial. *Id.* Therefore, even if Stokes's confession were improperly admitted, we would still consider it in evaluating his sufficiency of the evidence claim.

Stokes emphasizes that his confession dealt not only with the two robberies of which he was convicted, but also included his confession to a third robbery charge, for which he was acquitted. Stokes contends that this reveals that the jury viewed the confession as suspect. Whatever the merits of this claim, the jury was not limited to the confession. A factfinder could reasonably rely on both the confession and Britt's testimony, and the two combined certainly support the conclusion that there was sufficient evidence to support the jury's verdict in this case.

Stokes's suppression claims are also without merit. Stokes's in-home arrest, although carried out without a warrant, was justified by consent. Because the consent exception to the warrant requirement applies, no evidence need be suppressed as a result of the arrest. Stokes correctly asserts that the Fourth Amendment generally "prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in

order to make a routine felony arrest." *Payton v. New York*, 445 U.S. 573, 576 (1980). However, this quote from *Payton* reflects an exception to the warrant requirement: a warrant is not required when the officers obtain consent to enter from the suspect or "from a third party who possesses common authority over the premises." *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990). This consent exception applies even when the third party does not possess actual authority to grant officers entry, so long as the officers reasonably believe the consenting person has such authority. *Id.* at 186-88. This is such a case.

Although the record does not contain evidence that the woman who answered the door of Stokes's room was his cotenant, the circumstances support the officers' conclusion that she shared authority over the premises. She answered the door of the one-room dwelling at a late hour, and the officers could see from the door that Stokes was asleep behind her. Her presence in the apartment while Stokes slept suggests she was more than a casual visitor. Further, the size and furnishings of the dwelling—the testimony showed that there was only one bed—further supported the conclusion that Stokes and the woman were cohabitating, and that she had authority to grant entry to the premises. Because "the facts available to the officer[s] at the moment . . . [would] warrant a man of reasonable caution in the belief that the consenting party had authority over the premises," *id.* at 188 (citing *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968)) (internal quotation marks omitted), the warrantless arrest of Stokes in his home was not a violation of the Fourth Amendment.

Stokes also argues that his confession should have been suppressed because it was obtained by police coercion. Stokes contends that under a totality of the circumstances test, his statements to the officers were involuntary and should therefore have been suppressed. In developing his involuntariness argument, however, Stokes specifically identifies only one factor in support of his claim: the officers' promise to inform the prosecutor of Stokes's cooperation. Because such promises do not support a finding of coercion, Stokes's claim was properly rejected.

Stokes's claim that the promise to make his cooperation known to the prosecutor amounted to coercion is unavailing.  This court has stated three requirements for finding that a confession was involuntary due to police coercion: "(i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; (iii) and the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement." *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999) (internal citations omitted).

The district court found that Kay had promised Stokes that the prosecutor would be made aware of Stokes's cooperation.  However, as the district court concluded, that promise alone did not render the confession coerced.  It is true that a promise of leniency "may render a confession coerced," depending on the totality of the circumstances.  *See United States v. Wiley*, 132 F. App'x 635, 640 (6th Cir. 2005) (quoting *Clanton v. Cooper*, 129 F.3d 1147, 1159 (10th Cir. 1997)).  Stokes argues that the promise to inform the prosecutor of cooperation is de facto fraud, essentially because the promise could be perceived by the defendant as a promise of leniency even though the officers know the Government is in no way obligated to provide such leniency.  But Kay testified that he advised Stokes that Kay could not promise anything about the prosecutor's actions, thereby explaining the limited nature of the promise.  Further, "promises to inform a prosecutor of cooperation do not, *ipso facto*, render a confession coerced," *Wiley,* 132 F. App'x at 640, and Stokes offers little more than Kay's statement regarding notifying the prosecutor of any cooperation in support of his coercion claim.

Although Stokes does not explicitly argue other grounds for finding his confession involuntary, he does assert in his statement of facts that he was placed in a small room, handcuffed to a chair, and interviewed over the course of several hours in the very early morning.  To the extent Stokes is urging that these assertions be factored into a totality of the circumstances review of his statement, the alleged facts do not support a finding of involuntariness.  If true, these facts suggest that Stokes may have been somewhat uncomfortable during his interview, but they do not elevate the notification promise to the level of coercion.  Nor do these alleged facts provide other

grounds for finding that Stokes's statement was coerced.  Although Stokes's initial custody and interview did last for approximately five hours, interviews lasting several hours (as opposed to entire days) are not considered to be of "great duration," *see United States v. Williams*, 612 F.3d 417, 422 (6th Cir. 2010), and are therefore not indicative of coercion.  Even if the five-hour time period did constitute great duration, it would need to be accompanied by other factors indicating coercion before the confessions were found to be involuntary.  *Id.*  This court has approved lengthy interrogations during the midnight hours, *see United States v. Redditt*, 87 F. App'x 440, 444 (6th Cir. 2003); *Ledbetter v. Edwards*, 35 F.3d 1062, 1069 (6th Cir. 1994), and Stokes did not offer any credible testimony or other argument that the duration or hour of his questioning led to his will being overborne.  Stokes's claim that he was handcuffed to a chair is not supported by any finding by the district court, but Agent Kay testified that Stokes may have had one hand cuffed to a chair during the interview.  However, the use of a single handcuff does not support a finding that the defendant's will was overborne where he was not denied other physical comforts.  *See, e.g.*, *United States v. Miller*, 48 F. App'x 933, 952-53 (6th Cir. 2002).

The other factors considered in the totality of the circumstances analysis weigh against a finding of involuntariness.  Stokes was given his Miranda rights orally and in writing, and he acknowledged at his hearing that he had an extensive criminal history and was familiar with his rights.  Further, Stokes had attended some college, and therefore had sufficient education to understand the Miranda warnings. Based on the totality of the circumstances, the district court did not err in denying Stokes's motion to suppress his confession as involuntary.

For the foregoing reasons, Stokes's judgment of conviction is affirmed.