NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0358n.06

**No. 20-3083**

**UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT**

**FILED**
Jul 21, 2021
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE |
| | ) | NORTHERN DISTRICT OF |
| RICHODE MEREDITH-HILL, | ) | OHIO |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

BEFORE: GIBBONS, COOK, and LARSEN, Circuit Judges.

JULIA SMITH GIBBONS, Circuit Judge. Richode Meredith-Hill was arrested in connection with a series of bank robberies that took place in Ohio in 2017. He was charged with two counts of aiding and abetting robbery under 18 U.S.C. § 1951(a) (Counts 1 and 3), two counts of aiding and abetting the use of a firearm during a crime of violence under 18 U.S.C. § 924(c)(1)(A)(ii) (Counts 2 and 4), and one count of aiding and abetting attempted armed robbery of a credit union under 18 U.S.C. §§ 2213(a) and (g) (Count 5). He went to trial and was convicted on Counts 1−4 and acquitted on Count 5. He was sentenced to 255 months, or 21 years and three months. Meredith-Hill appeals on four grounds: (1) the district court's denial of his motion to suppress statements made during his custodial interview, (2) the fact that the jury instructions presented two alternative theories of liability, (3) the prosecutor's statements made during closing arguments, which he argues misrepresented the evidence, and (4) the reasonableness of his sentence. We reject all four grounds and affirm the district court.

I.

On April 3, 2017, three masked men attempted to rob the Buckeye State Credit Union in Shaker Heights, Ohio. They were ultimately unsuccessful because the machine that dispensed money was not functioning. During the course of the attempted robbery, one man held a teller at gunpoint and attempted to physically force her to get money from the dispenser by grabbing her hair and pushing her towards the machine. One of the men pulled another employee out of a back office. After they were unable to get money from the dispensing machines, the three men ultimately fled the scene empty-handed.

Two hours later, three men wearing gloves and hoodies pulled tight around their faces robbed the Cardinal Community Credit Union in Willoughby, Ohio. One of the men jumped over the counter, pointed a gun at the teller, and demanded that she open the drawer. She initially struggled to do so, but when the man grabbed her hair and pushed her to her knees, telling her to get "the fucking money fast," she opened the drawer and the man retrieved $2,905.15. A second man jumped over the counter, running into the kitchen where he found another employee, pointed a gun at the employee, and ordered her to the floor. The third man held yet another teller at gunpoint and took $7,434 from that employee's drawer. One of the robber's guns had "distinct features with a black slide and an orange handle." DE97, Trial Tr. Vol. 3, Page ID 804:15−17.

Following the successful robbery of the Cardinal Community Credit Union, the three men escaped in a waiting getaway car. A plainclothes patrol officer was driving nearby when she saw a silver Ford Fusion with four men inside coming from the direction of Cardinal Community run a red light. After the car ran another red light, the officers began pursuit, reaching speeds of 90 to 100 miles per hour during the 90-second chase. The Ford Fusion mounted the berm and took an

exit, then crossed a grassy ditch to get back on the highway. Because of the amount of traffic and the danger of the pursuit, the officer stopped the chase.

The Ford Fusion was ultimately recovered several days later and was determined to have been stolen. The police recovered some gloves, a bag, a "Cardinal Community Credit Union envelope . . . with the name 'Janelle' handwritten on it,"[1] and a live round of ammunition from the car. *Id.* at Page ID 820:1−823:8. DNA analysis linked the bag to one Lashawn Davis, one of the gloves to Richode Meredith-Hill[2] and his brother Dajuan Meredith, and another set of gloves to Davis and a fourth man, Ray Hoskins. Dajuan Meredith's DNA was also found on the steering wheel of the car.

On May 22, 2017, a third attempted robbery took place at the Eaton Family Credit Union in Wickliffe, Ohio. The attempted robbers were wearing "hoods close to their faces, [and] surgical masks and gloves[.]" *Id.* at Page ID 888:20−22. An employee who saw the men exit their car and run towards the bank locked the doors, so the would-be robbers "took off." *Id.* at Page ID 888:24−89:6.) When an officer responded to calls about the attempted robbery, he found a black shirt in a parking spot in front of the door. The officer spoke with one of the bank's tellers, as well as a plumber who had witnessed the incident, and they told him that the shirt had fallen out of the car that the would-be robbers had been driving. The plumber also informed the officer that the men who had attempted to rob the Credit Union were wearing "blue surgical gloves and surgical masks," and "had sweatshirts that were tied tightly around their faces." *Id.* at Page ID 774:12−16.

---

[1] One of the Cardinal Community tellers present during the robbery was named Janelle Colini.

[2] At the time that the police tested the glove, Meredith-Hill was not yet a suspect and his DNA was not on file. The department noted that there was an unknown contributor to the DNA on the glove. Later, after Davis named Meredith-Hill and the police secured a DNA sample, analysts were able to confirm that Meredith-Hill's DNA matched the DNA on the glove.

The police department tested the shirt for DNA and found DNA from three contributors, including Meredith-Hill.

A different stolen silver car, this time a Hyundai, was used in the May incident. That car was ultimately recovered in Euclid Ohio "right around the corner from" where the Meredith family was living at the time. *Id.* at Page ID 978:22−79:8.

The police conducted further investigation into the purchase of the distinctly-colored gun that was used in the Cardinal Community Credit Union robbery and learned that "there were records that showed that [it] was purchased by Arvis Williams in March[, 2017,]" *id.* at Page ID 806:12−16; Williams later sold the gun to one of Davis's best friends who either gave or sold it to Davis.

The police arrested Davis on March 16 2018 in connection with his possession of firearms. Davis was a member of the Rack Gang, which he described as a "movement . . . like a rap group." DE98, Trial Tr. Vol 4, Page ID 1139:16−40:7. Meredith-Hill, Meredith, Hoskins, and Williams are all also members of the Rack Gang. The police were able to find and identify Davis and a number of the other members of the Rack Gang through their use of social media. Because one of the guns recovered from Davis's home matched the description of the unusually-colored gun used in the bank robberies, the police questioned him about the string of robberies. Davis confessed to his involvement in both the Buckeye and Cardinal Credit Union robberies. He also named Hoskins, Meredith, and Meredith-Hill in connection with the April 3 robberies (but not the May 22 attempted robbery of Eaton Family Credit Union, the subject of Count 5), stating that Hoskins had been the driver and that Meredith-Hill had been one of the three men inside the banks. Davis later contradicted that statement. After Davis had pled guilty to armed bank robbery and carjacking, he testified at Meredith-Hill's trial where he told the jury that Meredith-Hill, Meredith,

4

and Hoskins had not been involved and that he "lied and said Richode Meredith[-Hill] had some involvement in [the April 3 robberies] so [he could] get [his] time reduced." *Id.* at Page ID 1125:21−22.

Based on Davis's initial interrogation in which he named Meredith-Hill, police obtained a search warrant for Meredith-Hill's DNA and arrested him. The officers brought him to an FBI building, swabbed his cheek for DNA, and interrogated him about the bank robberies. The interrogation began with the officers reading a standard Advice of Rights form to Meredith-Hill, who signed it. While Meredith-Hill initially maintained that he had nothing to do with the bank robberies, he eventually stated that he was driving the getaway car and said that Davis and Hoskins were involved. He did not name his brother, Dajuan Meredith. Meredith-Hill went to trial, where it was not entirely clear whether the government believed that he entered the bank or was the getaway driver, but it believed him to be one of the four men responsible.

At trial, several officers, bank employees, witnesses, and experts in DNA and photograph analysis testified. During her closing argument, one of the prosecutors alluded to the DNA analyst's testimony regarding the traces of Meredith-Hill's DNA recovered from one of the gloves. The prosecutor said that, in order to get "an interpretable amount of DNA[,] . . . [y]ou've got to wear the glove. You've got to do something with the glove, rob a bank with the glove . . ." DE100, Trial Tr. Vol. 6, Page ID 1444:13–22. She further told the jury that they could find Meredith-Hill guilty of aiding and abetting whether they believed he inside the or was the getaway driver.

The jury returned a guilty verdict as to aiding and abetting the armed robberies of the Buckeye State and Cardinal Community Credit Unions (Counts 1−4), but found Meredith-Hill not guilty of the attempted robbery of the Eaton Family Credit Union (Count 5). The court sentenced Meredith-Hill to 255 months, consisting of 87 months for Counts 1 and 3, to be served

concurrently, and 84 months each for Counts 2 and 4, to be served consecutively. He also received five years of supervised release, a $400 special assessment, and was ordered to pay $10,339.15 in restitution to Cardinal Community Credit Union.

## II.

Meredith-Hill appeals the admission of the statement he made to police, the jury instruction allowing the jury to find that he either entered the bank with the other men or served as the getaway driver, the prosecution's statement that he had to "rob a bank" in order to leave interpretable amounts of DNA, and his sentence.

### A.

#### i.

Meredith-Hill first appeals the admission of statements he made during his custodial interrogation. "In reviewing a district court's denial of a motion to suppress, we review the factual findings for clear error and the legal conclusions de novo." *United States v. Branch*, 537 F.3d 582, 587 (6th Cir. 2008) (citing *United States v. Graham*, 483 F.3d 431, 435 (6th Cir. 2007)). "We review the evidence 'in the light most likely to support the district court's decision.'" *United States v. Davis*, 514 F.3d 596, 607 (6th Cir. 2008) (quoting *United States v. Foster*, 376 F.3d 577, 583 (6th Cir. 2004)). We may find clear error in the district court's factual findings only if we are "left with the definite and firm conviction that a mistake has been committed." *United States v. Navarro-Camacho*, 186 F.3d 701, 705 (6th Cir. 1999). Specifically, "'[i]n determining the voluntariness of a confession, a reviewing court will not disturb the trial court's findings concerning specific events surrounding the confession unless clear error appears on the record.'" *United States v. Ray*, 803 F.3d 244, 265 (6th Cir. 2015) (alteration in original) (quoting *United States v. Wrice*, 954 F.2d 406, 410–11 (6th Cir. 1992)).

ii.

As noted above, the police became interested in Meredith-Hill as a potential suspect in the bank robberies when Davis named him in an interview. Meredith-Hill was subsequently arrested on unrelated charges and brought to juvenile court, where FBI officers picked him up and took him to a separate FBI building. The interrogating officer, Special Agent William Hasty, "provided the Miranda warning" when the two "got to the building." DE96, Suppression Hr'g Tr., Page ID 724:10−13. Hasty confirmed that Meredith-Hill spoke and read English, read him his rights off the form, and had him sign the document. Meredith-Hill never indicated that he was confused or did not understand the nature of his rights, and he responded coherently to the agents' questions and remarks. Hasty testified that Meredith-Hill seemed "lucid and alert," and like he "understood [the] conversation." *Id.* at Page ID 728:20−23. He also testified that Meredith-Hill "did not appear to be . . . intoxicated or high or sleep deprived." *Id.* at Page ID 729:1–3. At the beginning of the interview, Hasty took a DNA sample from Meredith-Hill, then proceeded to a more formal interview. About an hour and a half in, Meredith-Hill shared details of the robberies with Hasty, who told him that cooperation "could potentially benefit him." DE96, Suppression Hr'g Tr., Page ID 730:20−31:3. Hasty suggested that he would be "happy" to discuss Meredith-Hill's acceptance of responsibility with the judge or prosecutor, something he had already done for other defendants involved in this string of robberies. *Id.* at Page ID 734:10−22. Meredith-Hill told Hasty that he was the driver of the getaway car during the robberies in the interview.

Meredith-Hill moved to suppress these incriminating statements, arguing that the waiver of his *Miranda* rights was neither knowing nor voluntary and that the underlying confession was involuntary. He argued that because he was only 19 years old at the time of the interview and did not understand the nature of his rights, the waiver was invalid. He also argued that Hasty made

illusory promises of leniency, which rendered the confession involuntary. The Magistrate Judge issued a report and recommendation that the court deny the motion to suppress because the government had demonstrated by a preponderance of the evidence that Meredith-Hill's statements "were made voluntarily, knowingly, and intelligently." DE30, R&R, Page ID 116. The district court adopted the recommendation.

On appeal, Meredith-Hill argues again that his waiver was neither knowing nor voluntary. A *Miranda* waiver must be "made voluntarily, knowingly and intelligently." *Moran v. Burbine*, 475 U.S. 412, 421 (1986) (quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). In determining whether a waiver is valid, this court must look at the totality of the circumstances from the perspective of the police and ask whether the police had any reason to believe that the suspect misunderstood the warnings. *United States v. Ramamoorthy*, 949 F.3d 955, 965 (6th Cir. 2020). A waiver is knowing "when it is 'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" *Id.* (quoting *Moran*, 475 U.S. at 421). "Waiver [of *Miranda* rights] is voluntary when 'it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.'" *Id.* at 964−65 (quoting *Moran*, 475 U.S. at 421). This court's test for determining whether the police coerced the subject is as follows: "(i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; and (iii) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement." *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999).

As to the knowing prong, Meredith-Hill asserts that the process was rushed, and further argues that Hasty was required to ask Meredith-Hill about his mental maturity, cognitive abilities, or mental health. The government responds that because Meredith-Hill confirmed that he

understood English before Hasty read his rights, and because Meredith-Hill never indicated that he was confused or did not understand what was happening, the prosecution met its burden.

Meredith-Hill's argument that he did not knowingly waive his *Miranda* rights is unsupported by the record. Hasty read Meredith-Hill his rights and Meredith-Hill signed a form waiving them. Meredith-Hill never gave Hasty any indication that he did not understand the conversation or the nature of his rights and coherently conversed with the interrogating agents throughout his interview. The relevant question before the court is not whether Meredith-Hill understood "every possible consequence of a waiver[,]" but rather whether he "knew that he could choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time." *Garner v. Mitchell*, 557 F.3d 257, 261 (6th Cir. 2009) (en banc) (alterations adopted) (quoting *Colorado v. Spring*, 479 U.S. 564, 574 (1987)). The very last line on the Advice of Rights form asked Meredith-Hill that exact question, and Meredith-Hill signed the form indicating that he understood his rights and was willing to answer questions without a lawyer. Because Meredith-Hill understood English, understood the statements that Hasty read to him, affirmatively signed a waiver, and proceeded to have a lengthy discussion with Hasty, his waiver was knowing. *United States v. Adams*, 583 F.3d 457, 467−68 (6th Cir. 2009) (holding that a waiver was knowing and valid where the officer "read [the defendant] his *Miranda* rights after [the defendant] was handcuffed, and asked if he understood those rights; [and the defendant] verbally responded 'I do'"). Without any indication that Meredith-Hill did not understand the proceedings, Hasty was not required to inquire further into Meredith-Hill's education, maturity, or mental state. *See Garner*, 557 F.3d at 262−63.

As to the voluntariness of the waiver, Meredith-Hill states that he was sleep-deprived, hungry, had stomach pains, and was interviewed for hours. He argues these factors, combined

with the fact that he was only 19 years old, was transported from the juvenile court to an FBI building, and was only briefly read the Advice of Rights, made his waiver involuntary. The government argues that his waiver was voluntary because Hasty did not coerce him and in fact observed him to be lucid and comfortable with the process.

Meredith-Hill's argument here is similarly unpersuasive. Although it is likely that Meredith-Hill was tired, and it is certainly true that he was young, Hasty testified that Meredith-Hill was "lucid and alert," "understood [the] conversation," and "did not appear to be . . . sleep deprived." DE96, Suppression Hr'g Tr., Page ID 728:20−729:3. Viewing the evidence in the light most favorable to the government, we see no reason to question Hasty's account. *See United States v. Crawford*, 943 F.3d 297, 310 (6th Cir. 2019).

Moreover, the legal standard requires that the court find that the police overreached in some way and coerced the subject of an interview in order to find that a waiver (or a confession itself) was involuntary. *Colorado v. Connelly*, 479 U.S. 157, 164, 167 (1986).[3] Examples of such overreaching include "exploit[ing] [a defendant's mental problems] with coercive tactics" such as "'eight- to nine-hour sustained interrogation[s]'" in tiny rooms packed with multiple officers, or giving the suspect drugs. *Id.* at 165 (quoting *Blackburn v. Alabama*, 361 U.S. 199, 207−08 (1960)). Hasty took no such coercive or overreaching steps. His demeanor was calm and professional, and his tone neutral. *See Ramamoorthy*, 949 F.3d at 965. If Meredith-Hill was tired or hungry, it was not because Hasty had deprived him of food or sleep; his two-hour interview was simply not long enough for the police to have exhausted him. *Cf. United States v. Crumpton*, 824 F.3d 593, 608 (6th Cir. 2016) (considering the fact that the defendant was cold as a factor in the totality of the

---

[3] *Colorado* is a case concerning the voluntariness of a confession under the Due Process Clause. However, because "[t]he test for whether a *Miranda* waiver is voluntary is essentially the same as the test for whether a confession is voluntary[,]" this case applies to both Meredith-Hill's due process voluntariness and waiver arguments. *United States v. Redditt*, 87 F. App'x 440, 445 (6th Cir. 2003).

circumstances analysis because the officers had actively caused him to be out in the cold.)  The fact that Meredith-Hill kept his hands, and sometimes his face, tucked into his shirt may well have indicated that he did not want to be there.  Although his behavior does demonstrate his desire to be elsewhere and highlight his young age, it does not speak to whether the police used coercive tactics.  And the interrogation video reveals that no such tactics were used.

Meredith-Hill also appears to briefly argue that the underlying confession was coerced and involuntary.  This argument largely restates the argument that his *Miranda* waiver was not voluntary, focusing specifically on Hasty's discussion about leniency and acceptance of responsibility which he argues was coercive.  Meredith-Hill is correct that "[p]olice promises of leniency and threats of prosecution can be objectively coercive."  *United States v. Johnson*, 351 F.3d 254, 261 (6th Cir. 2003).  However, "promises to inform a prosecutor of cooperation do not, *ipso facto*, render a confession coerced."  *United States v. Stokes*, 631 F.3d 802, 808 (6th Cir. 2011) (quoting *United States v. Wiley*, 132 F. App'x 635, 640 (6th Cir. 2005)).  For example, a promise such as Hasty's could be coercive if it were broken or illusory, or if it were coupled with a threat of prosecution.  *Johnson*, 351 F.3d at 262.  There is nothing in the record about whether Hasty ultimately spoke with Meredith-Hill's prosecutor or judge.  *See United States v. Binford*, 818 F.3d 261, 272 (6th Cir. 2016).  And the fact that he had already followed through on similar offers to other defendants involved in these bank robberies would tend to suggest that the promise was not broken or illusory.

Because Meredith-Hill was read his *Miranda* rights and affirmatively signed a waiver, and because the police did not overreach or otherwise coerce him into answering their questions and waiving his rights, we affirm the district court's denial of his motion to suppress.

B.

i.

Meredith-Hill's second argument is that the jury instructions impermissibly presented two alternative theories of liability.  This court generally reviews challenges to jury instructions for abuse of discretion to determine whether "the instructions, taken as a whole, fairly and adequately state the controlling law."  *United States v. Taylor*, 9 F. App'x 465, 468 (6th Cir. 2001).  However where, as here, the defendant fails to object to the jury instructions before the district court, this court reviews for plain error.  *United States v. Newsom*, 452 F.3d 593, 605 (6th Cir. 2006).  Reversal under the plain error standard requires Meredith-Hill to demonstrate "(1) error (2) that 'was obvious or clear,' (3) that 'affected defendant's substantial rights' and (4) that 'affected the fairness, integrity, or public reputation of the judicial proceedings.'"  *United States v. Vonner*, 516 F.3d 382, 386 (6th Cir. 2008) (en banc) (quoting *United States v. Gardiner*, 463 F.3d 445, 459 (6th Cir. 2006)).

ii.

The judge instructed the jury that "the government must prove . . . that [Meredith-Hill] did something to help the crime with the intent that the crime be committed."  DE100, Trial Tr. Vol. 6, Page ID 1365.  Meredith-Hill argues that this was an error because the court did not specify the exact conduct, or theory of liability, of which the jury had to find him guilty.  He argues that the court's use of the word "something," combined with the prosecution's "nudging" comments—that "whether he drove that getaway car, or whether he went into the bank does not matter"—lowered the prosecution's burden and affected the fairness, integrity, and public reputation of his judicial proceedings.  CA6 R.37, Appellant's Br., at 18, 28 (quoting DE100, Trial Tr. Vol. 3, Page ID

12

1395). The government responds that this jury instruction, which mirrors the Sixth Circuit pattern instruction for aider-and-abettor liability, did not misstate the law.

The government is correct that there is "no general legal requirement that jurors must unanimously agree on a theory of guilt." *Tackett v. Trierweiler*, 956 F.3d 358, 371 (6th Cir. 2020). The question before us is whether the alternative theories are "mere means of committing a single offense, rather than independent elements of the crime." *Schad v. Arizona*, 501 U.S. 624, 636 (1991) (plurality opinion); *see also Mathis v. United States*, 136 S. Ct. 2243, 2249 (2016); *Richardson v. United States*, 526 U.S. 813, 817 (1999). If they are different means of committing the same offense, then the prosecution may submit two alternative theories of liability and the jury need not unanimously agree on which theory they are relying. *Schad*, 501 U.S. at 636. If, however, the theories are independent elements, then the government may not present them as independently sufficient but must prove both beyond a reasonable doubt. *Id.*; *see also Coe v. Bell*, 161 F.3d 320, 348 (6th Cir. 1998) ("Admittedly, it is acceptable for a first-degree murder conviction to be based on two alternative theories even if there is no basis to conclude which one (if only one) the jury used.").

Unlike in many of the cases cited above, Meredith-Hill was not charged with both the principal offense and, in the alternative, the aiding and abetting offense. In *Tackett*, for example, the defendant was charged with both first-degree murder and as an aider and abettor. *Tackett*, 956 F.3d at 371. The question becomes, therefore, whether both of the theories presented by the prosecution would be sufficient to find him liable solely as an aider and abettor. If so, then the instruction that "the government must prove . . . that [Meredith-Hill] did something to help the crime with the intent that the crime be committed" would be an accurate statement of law. DE100, Trial Tr. Vol. 6, Page ID 1365. The prosecution said that whether Meredith-Hill "drove [the]

getaway car, or whether he went into the bank, does not matter." *Id.* at 1395. The prosecutor was correct. A person is liable under 18 U.S.C. § 2 for aiding and abetting a crime if "he (1) takes an affirmative act in furtherance of that offense, (2) with the intent of facilitating the offense's commission." *Rosemond v. United States*, 572 U.S. 65, 71 (2014). If the jury believed that Meredith-Hill entered the bank and helped the other two men to rob it (or attempt to rob it), then they believed that he took an affirmative act in furtherance of the bank robbery with the intent of facilitating the bank robbery. If they believed that he drove the getaway car, they arrived at the same conclusion. As such, a specific unanimity instruction was not required. *See United States v. Davis*, 306 F.3d 398, 414 (6th Cir. 2002) ("[A]lthough there may have been various means by which Defendant aided and abetted in the underlying offenses for which he was convicted, no unanimity instruction with regard to these various means was necessary.").

In sum, the court's instruction that the jury must find that Meredith-Hill did something to further the bank robbery was a correct description of federal aider and abettor law. Further, it did not decrease the prosecution's burden to allow the jury to find that he aided and abetted the crime either by entering the bank or by driving the getaway car.

## C.

### i.

Meredith-Hill's third argument is that the prosecutor's statements regarding the DNA evidence found on one of the gloves constituted prosecutorial misconduct. Because Meredith-Hill objected to the prosecutor's statements during trial, we review his claim of prosecutorial misconduct de novo and "within the context of the trial to determine whether such comments amounted to prejudicial error." *United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001) (citing

*United States v. Young*, 470 U.S. 1, 11−12 (1985)); *United States v. Kuehne*, 547 F.3d 667, 687 (6th Cir. 2008).

ii.

At trial, the DNA analyst explained that "[m]ost of the time to get an interpretable contact DNA profile, it requires significant contact." DE98, Trial Tr. Vol. 4, Page ID 1069:10−14. She gave the example that if she "were just to pick up this piece of paper and move it over here, [she was] not making enough contact to leave a sufficient amount of DNA behind in order to develop a DNA profile." *Id.* She further explained that "a person that wears a pair of gloves . . . just to run outside and do something" would not leave as much DNA as a person who wore the gloves every day. *Id.* at Page ID 1069:24−70:5. She summed up by saying that "a minute amount of contact is generally not going to be enough to identify an individual." *Id.* at 1070:12−13. The prosecutor recalled this testimony at closing by saying that "[y]ou've got to wear the glove. You've got to do something with the glove, rob a bank with the glove, to get . . . interpretable DNA." DE100, Trial Tr. Vol 6, Page ID 1444:20−22.

Meredith-Hill argues that the prosecutor's discussion of DNA was a misstatement of the evidence presented at trial and warrants reversal. The government argues that the statement was a reasonable inference about the length of time it is necessary for a person to wear gloves for discernable DNA samples to be deposited.

We have a "two-step approach for determining when prosecutorial misconduct warrants a new trial." *Carter*, 236 F.3d at 783. First, we "consider whether the prosecutor's conduct and remarks were improper." *Id.* If they were, then we move on to determine whether the impropriety was flagrant and prejudicial, thereby warranting reversal. *Id.*

15

Meredith-Hill falters at the first step. Prosecutors may not offer personal opinions as to anything presented at trial during closing arguments, but "counsel must be given leeway to argue reasonable inferences from the evidence." *United States v. Collins*, 78 F.3d 1021, 1040 (6th Cir. 1996); *United States v. Francis*, 170 F.3d 546, 551 (6th Cir. 1999). Here, the prosecutor was merely suggesting that the presence of Meredith-Hill's DNA on the glove, coupled with the DNA analyst's testimony, permitted a jury finding that Meredith-Hill wore the glove long enough to have participated in the robbery.

In addition, the prosecutor was not "bring[ing] to the jury's attention purported facts that [were] not in evidence and [were] prejudicial." *United States v. Wiedyk*, 71 F.3d 602, 610 (6th Cir. 1995). Rather, she was reiterating what the DNA analyst had said—that one has to do more than merely touch an object to leave DNA and that the longer you wear something like a glove the more DNA you will leave—and then applying it in the context of the bank robbery. Thus, her remark summarizing the factual import of lengthy testimony from the DNA analyst, was not improper; it simply "reflect[ed] reasonable inferences from the evidence adduced at trial." *Francis*, 170 F.3d at 551 (quoting *United States v. Veal*, 23 F.3d 985, 989 (6th Cir. 1994)); *see United States v. Emuegbunam*, 268 F.3d 377, 405–06 (6th Cir. 2001). Moreover, the jury instructions further made clear that "[t]he lawyers' statements and arguments are not evidence," ensuring that Meredith-Hill suffered no prejudice from the isolated remark. DE100, Trial Tr. Vol. 6, Page ID 1354.

## D.

### i.

Finally, Meredith-Hill argues that his sentence was substantively unreasonable. We review the substantive reasonableness of a sentence for abuse of discretion. *United States v. Rucker*,

874 F.3d 485, 487 (6th Cir. 2017). There is a presumption of reasonableness for sentences that are within the defendant's guideline range. *United States v. Zobel*, 696 F.3d 558, 569 (6th Cir. 2010). "A sentence is substantively unreasonable if 'the court placed too much weight on some of the § 3553(a) factors and too little on others.'" *United States v. Milliron*, 984 F.3d 1186, 1195–96 (6th Cir. 2021). We must give deference to "the district court's conclusion that the sentence imposed is warranted by the § 3553(a) factors[,]" and "the mere fact that we might have reasonably concluded that a different sentence was appropriate is insufficient to justify reversal of the district court." *Zobel*, 696 F.3d at 569 (internal quotation marks omitted). Finally, "[f]or a sentence to be substantively reasonable, it must be proportionate to the seriousness of the circumstances of the offense and offender, and sufficient but not greater than necessary, to comply with the purposes of § 3553(a)." *United States v. Vowell*, 516 F.3d 503, 512 (6th Cir. 2008) (internal quotation marks omitted).

ii.

Meredith-Hill makes three primary arguments as to the reasonableness of his sentence. First, he argues that he cannot be subject to enhancements for both conduct that occurred inside the credit union and conduct that happened in the car because he cannot have both participated inside the bank and been the getaway driver. Second, he argues that his brother Dajuan Meredith was convicted of the same, or more serious, crimes but received a lower sentence. Third, he argues that he is not a threat to the public. We consider Meredith-Hill's arguments in turn.

Meredith-Hill labels all three challenges as going to the substantive reasonableness of his sentence. He argues that he cannot be subject to 2-level increases under U.S.S.G. § 2B3.1(b)(1), (b)(4)(B) *and* § 3C1.2 because the first two concern conduct that happened inside the banks (the taking of property and the physical restraint of the bank tellers) and the third concerns the conduct

of the getaway driver (reckless endangerment). This argument mirrors to some extent his argument about the jury instructions. The answer before this court is clear. Sentencing Guideline § 1B1.3 (Relevant Conduct) makes clear that defendants are liable for "all" conduct during "a criminal plan" that was "within the scope of the jointly undertaken criminal activity, . . . in furtherance of that criminal activity, . . . and reasonably foreseeable in connection with that criminal activity." U.S.S.G. § 1B1.3; *see Edwards v. United States*, 523 U.S. 511, 514 (1998). In fact, the Application Notes specifically give the example of a getaway driver in an armed bank robbery, who is "accountable for the money taken[,] . . . [and] the injury to the teller" inside the bank. *Id.* at Application Note 4(B)(i).

Next, Meredith-Hill argues that his sentence, which is considerably longer than his brother's, created an unwarranted disparity. Dajuan Meredith was sentenced to 15 years for six armed robberies and gang-related conduct, whereas Meredith-Hill was sentenced to over 21 years for two armed robberies, and his conviction makes no mention of gang-related activities. District courts are directed to consider sentencing disparities under § 3553(a)(6). However, as both parties note, this factor "concerns *national* disparities between defendants with similar criminal histories convicted of similar criminal conduct—not disparities between codefendants." *United States v. Conatser*, 514 F.3d 508, 521 (6th Cir. 2008). In drafting § 3553(a), "Congress sought uniformity in sentencing by narrowing the wide disparity in sentences imposed by different federal courts for similar criminal conduct, as well as proportionality in sentencing through a system that imposes appropriately different sentences for criminal conduct of different severity." *Rita v. United States*, 551 U.S. 338, 349 (2007) (internal quotation marks and emphasis omitted).

It is true that the court "*may*" consider disparities between codefendants, but "the district court is not *required* to consider that type of disparity." *United States v. Simmons*, 501 F.3d 620,

624 (6th Cir. 2007). Even so, there are several "distinguishing factors in the record" that must be noted. *United States v. Stewart*, 628 F.3d 246, 260 (6th Cir. 2010). First, Dajuan Meredith was charged with state offenses and sentenced by a state court. Second, he accepted responsibility and pled guilty, while Meredith-Hill went to trial. *See id.* ("[T]he court noted the coconspirators' acceptance of responsibility and/or cooperation with authorities as factors that it considered in each of their sentencings.") Third, Dajuan was charged in juvenile court. Taken as a whole, these factors demonstrate that the district court did not abuse its discretion, despite the stark difference between the two brothers' sentences.

Finally, Meredith-Hill briefly argues that he is not a threat to the public, citing his prior employment and his family life. This speaks to the district court's application of the § 3553(a) factors, for which we cannot substitute our own judgment. *Zobel*, 696 F.3d at 569. The district court examined Meredith-Hill's criminal history, which included domestic violence, assault, and attempted burglary. The court discussed the offense conduct, which included a high-speed chase, physical restraint of bank employees, the brandishing of guns, and theft of over $10,000. The court considered Meredith-Hill's family life, his difficult childhood, and his potential mental health and substance abuse issues. The court heard from Meredith-Hill's mother and from Meredith-Hill himself. Ultimately, the court decided that those factors, considered as a whole, justified a bottom-of-the-guidelines sentence of 255 months. That was not an abuse of discretion.

Because Meredith-Hill's arguments about his sentence lack merit, we affirm the sentence.

### III.

In conclusion, we affirm the district court on all grounds. The prosecutor's remarks in closing arguments were not improper. As to the other grounds, Meredith-Hill validly waived his

*Miranda* rights, and the district court did not err as to the jury instructions or abuse its discretion as to his sentence.